[Cite as *State v. Bond*, 2016-Ohio-8383.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio

Appellee

v.

Henry Bond

Appellant

Court of Appeals No. WD-15-070

Trial Court No. 15 CR 145

**DECISION AND JUDGMENT**

Decided: December 23, 2016

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, Thomas
Matuszak, Chief Assistant Prosecuting Attorney, David T. Harold
and Martha S. Schultes, Assistant Prosecuting Attorneys, for appellee.

Mollie B. Hojnicki-Mathieson, for appellant.

* * * * *

**SINGER, J.**

{¶ 1} Appellant, Henry Bond, appeals from the October 22, 2015 judgment of the

Wood County Court of Common Pleas sentencing him following his jury conviction of

one count of felonious assault, a violation of R.C. 2903.11(A)(1) and 2903.11(D)(1)(a),

and one count of felonious assault, a violation of R.C. 2903.11(A)(2) and 2903.11(D)(1)(a), both of which also included firearm specifications, R.C. 2941.145(A). Finding the two offenses were allied offenses of similar import, the convictions merged for purposes of sentencing. Appellant was sentenced on Count 2 to terms of three years imprisonment on the base offense and three additional years on the firearm specification. For the reasons which follow, we affirm.

{¶ 2} On appeal, appellant asserts the following assignments of error:

FIRST ASSIGNMENT OF ERROR: THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS.

SECOND ASSIGNMENT OF ERROR: APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

THIRD ASSIGNMENT OF ERROR: THE TRIAL COURT ERRED BY ALLOWING IMPROPER EVIDENCE BEFORE THE JURY AND PREVENTED PROPER EVIDENCE FROM GOING BEFORE THE JURY.

FOURTH ASSIGNMENT OF ERROR: APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS.

**Evidence Presented at Trial**

{¶ 3} Appellant admitted that on April 7, 2015, he shot his stepdaughter, B.W., two times while she was in his residence at an assisted living facility. He asserted that he had acted in self-defense because he believed she was reaching for her gun.

{¶ 4} On the day of the shooting, B.W.'s siblings, R.B. and M.W., were packing the belongings of their mother, appellant's wife, before moving her to a specialized memory care facility. R.B. and appellant testified B.W. knew she was not allowed in the assisted living apartment where their mother lived with appellant and that she was upset by the ban. B.W. denied having been banned from the apartment, but she admitted appellant had refused her admission to the apartment a few days before the shooting. She also testified she knew she was not allowed to stay in her mother's apartment because appellant was scared someone would steal something. The family also testified B.W. was specifically told not come to the apartment on the day of the move. Yet, they called her to help. M.W. testified he had boxes outside the assisted living facility B.W. could go through. R.B. testified she asked B.W. to help at the new facility. B.W. testified her siblings had asked her to come to their mother's apartment.

{¶ 5} According to appellant and R.B., the family never had a good relationship with B.W. because of her volatile personality. Appellant believed B.W. resented his marriage to her mother when B.W. was 12 years old. He further testified B.W. had been disrespectful as a child and had once thrown a knife at him after he had hit her with a belt. B.W. testified she believed appellant shot her because he hated her. M.W. testified

the siblings were able to get along and that, despite her contentious and outspoken personality, B.W. was protective of her siblings and their mother.

{¶ 6} R.B. had been given a power of attorney to make decisions for their mother even though she lived out of state. R.B. testified that while she kept B.W. informed, R.B. did not seek input from B.W. regarding decisions. B.W. objected to her mother's move. B.W. also blamed appellant for their mother's recent overdoses on castor oil and cough syrup and her falls. B.W. accused appellant of overmedicating or drugging her mother. B.W. testified appellant had refused to listen to her suggestions to keep her mother safe. She also accused appellant of not helping her mother in the apartment and leaving medication in a jar that her mother could open. R.B. testified B.W. threatened to harm appellant because of these events. R.B. did not believe appellant was harming their mother. R.B. also testified that B.W. was obsessed about appellant taking their mother's things.

{¶ 7} M.W. was at the front of the building when B.W. arrived that day. He believed she looked upset as she walked by him carrying her purse. B.W. testified she stopped to talk to M.W. and he did not tell her she could not go to the apartment. R.B. testified she was concerned when B.W. showed up at the apartment as R.B. was leaving the building. R.B. knew B.W. was specifically upset that day about moving their mother. To avoid an altercation, R.B. did not try to stop B.W. B.W. testified she went up the elevator and passed R.B. on the third floor, while she was on the phone, and her sister did not attempt to talk to B.W. as she exited the elevator.

4.

{¶ 8} Appellant and R.B. testified they knew B.W. had a permit to conceal and carry a weapon. R.B. knew B.W. carried the gun because of the crime in her Detroit neighborhood where she lived in the family home prior to moving to Maumee, Ohio, to be close to her mother and help with her care. However, no one testified they saw B.W. carrying a gun on the day of the shooting. B.W. testified she always carried her weapon in a holster on her side so she could cross-draw it; but she denied carrying her gun that day because the facility did not permit guns. She testified she had never used her weapon other than on a gun range except for one time when she had to shoot her pit bull who attacked her. M.W. had never seen B.W. carry a gun in a holster. R.B. had seen B.W.'s weapon in her purse on a prior family get-together. B.W. arrived at the apartment carrying only her purse, which she testified was large enough to hold her gun if the purse was empty. After the shooting, B.W. claimed to have left her purse in the apartment. None of the police officers recalled seeing a purse. R.B. claimed to have returned to the apartment later that night to retrieve the purse and delivered it to B.W. R.B. did not search the purse, but noted it was heavy. R.B. observed B.W. remove her keys from the purse, but R.B. could not see inside the purse.

{¶ 9} No one was aware that appellant had guns in his apartment. He speculated his wife moved the guns to the apartment because he later found them there. Guns are not permitted to be kept in the facility and there are signs posted at every door. B.W. testified she knew her stepfather owned guns because she had seen one of the handguns before and had also seen him with other guns, such as a machine gun wrapped in a towel.

5.

{¶ 10} Appellant testified B.W. entered the unlocked apartment that day without invitation by hitting the door open. She denied hitting the door open and testified the door was open and she merely walked into the apartment. R.B., however, testified that the door to the apartment automatically closed.

{¶ 11} Appellant testified he saw B.W. enter the apartment carrying something like a bag and that she had a mean look on her face. She did not respond to his question of why she was there. Appellant testified he anticipated trouble because of her past conduct and her look. He had his guns out just in case she had a gun or fought with him. He was concerned she would bite him because she had AIDS. R.B. confirmed that B.W. is HIV positive and previously had full-blown AIDS. R.B. knew appellant was worried about the grandkids being around B.W. for this reason.

{¶ 12} B.W. testified she laid her purse on a chair in the living room across from her stepfather, who was standing in the doorway, after she entered the apartment. She was surprised when he asked her why she was there. She denied that he had said she was not welcome and asked her to leave. Had he done so, she testified she would have left. She ignored him and went to her mother who was standing around boxes. She could see her mother was agitated and nervous and B.W. was focused on getting her mother to relax. She walked with her mother into her bedroom and looked in her mother's closet to determine what to pack. She could see appellant sitting in a chair in the living room doing something in a silver suitcase.

6.

{¶ 13} When B.W. left the bedroom, appellant was standing 10-12 feet away in the threshold of the door where he had been standing earlier. Appellant testified he held his guns down at his side as he told B.W. to get out and B.W. did not respond. B.W. testified he said, "Get out of my apartment," in an aggressive voice. At that time his hands were straight down behind his legs. She did not see him holding any guns. He seemed to be calm and acting as he always does. Her purse was two feet away from her on her left. She said "okay" and turned her back to appellant to reach for her purse without blocking appellant's view of her purse. As she turned and touched the strap of her purse, she heard him scream and felt something pass into her right thigh. She said, "Henry, you shot me." She turned around and stepped toward him and fell to the ground. After she fell, she felt a pain in her hip. She was shot in the buttocks and in the right thigh. Appellant still had his guns in his hands. She said to him, "Henry, you shot me, go on and kill me because I ain't never liked you anyway." On cross-examination, B.W. testified she had said, "Henry, go on and kill me. I never liked it here anyway." She testified that she told the police appellant put both guns to her head and said, "Look what you made me do." B.W. testified she was completely surprised by the shooting.

{¶ 14} B.W. further testified her sister came into the apartment and said to Henry, "What did you do?" He responded, "I just shot her…I just don't need her living." B.W. heard her sister say something to appellant and they left the apartment. She never heard appellant say he thought B.W. was going for a gun or weapon or explain why he had shot her. She did hear him say, "Lucky I didn't kill her. I don't usually leave them living."

7.

{¶ 15} Appellant testified he did not call the police for help when B.W. entered his apartment because he did not think there was time. When B.W. left the bedroom, he did not see her carrying anything; but, as she reached for her purse, he raised his guns and fired both at the same time because he knew she carried a gun. He testified he shot B.W. out of self-defense because he felt like she was going to shoot him. Appellant further testified that if he had wanted to kill her, she would have been dead. He had started to aim at her head, but he lowered the gun to shoot her in the buttocks. He testified it was an act of mercy not to kill her because he felt he could not kill his wife's daughter.

{¶ 16} R.B. testified that when she returned to the apartment, she heard raised voices. When she opened the door, she found her sister on the floor, and appellant standing nearby with a gun in each hand pointing at the ground. Appellant was agitated and did not seem like himself. B.W. was yelling, "Why don't you just kill me." Appellant was ranting and asking R.B. "Why did you let her in here?" Appellant testified he never told R.B. when she arrived on the scene that he thought B.W. was going to kill him. R.B. testified she told appellant to follow her if he loved her. He answered, "I do love you" and he walked out of the apartment with her. R.B. was not sure if appellant would shoot her as well. She asked appellant to put down the guns, but he would not.

{¶ 17} In the hall, appellant saw his friend, Bill Frank. Appellant told Frank to leave because bad things might happen. Appellant explained at trial he believed the police would kill him because he was R.B. and had a gun. Frank testified when he saw appellant, his guns were pointing down at his sides and he was very calm and friendly.

8.

Frank had seen appellant's stepdaughter at the facility in the past but had not met her. Frank could not recall appellant ever having indicated an issue with his stepdaughter.

{¶ 18} Don Brenneman, the maintenance superintendent for the assisted living facility had known appellant since he came to the facility in 2012. Appellant had always been talkative, friendly, courteous, compassionate, and well-mannered toward Brenneman. Brenneman was called to check on a disturbance and found R.B. in the hallway, on her phone and crying. He saw appellant in the hallway holding a handgun in each hand pointing straight out, but he was very calm. Brenneman asked appellant to put the guns down on a nearby table and walk towards Brenneman. Appellant complied and Brenneman moved to stand between appellant and the guns. At trial, Brenneman could not recall talking to appellant afterward, but in his statement to the police Brenneman stated that appellant had told Brenneman, "I shot her," and "I was getting ready to put a bullet in her head." R.B., who was nearby, said "I don't know if she's dead or alive." R.B. testified she was on the phone with 911 and did not hear appellant make any statements to Brenneman. Brenneman further testified appellant had never asked to have B.W. blocked from visiting his apartment.

{¶ 19} The police arrived on the scene and found appellant in a chair. Brian Gregg, a Perrysburg police sergeant, testified that as he approached, appellant stood up and stated, "I know I'm going to jail." Appellant never made a statement that he had feared for his life and was very cooperative. The officer placed handcuffs on appellant

9.

and he was removed. A paramedic handed the officer a bullet they had found when they cut off B.W.'s pant leg.

{¶ 20} Officer Crosby of the Perrysburg Police Department testified he saw Detective Patrick Jones take the guns and heard Brenneman say appellant had said, "I was going to shoot her in the head." The officer found R.B. on the phone contacting an attorney and overheard her state appellant had shot her sister. R.B. told the officer that B.W. had been asked not to come to the apartment because there had been an argument the week beforehand and appellant had told her not to come into the apartment. R.B. never indicated her sister had a gun.

{¶ 21} Rich Cartwright, a police detective, testified that when he arrived on the scene, B.W. had already been removed by paramedics. He searched the apartment and found a silver briefcase in the den that contained a holster and ammunition. No firearms were discovered in the apartment. The detective determined two shots had been fired from the guns appellant had placed on the table. There was no evidence of a struggle in the apartment. He did not find a purse on the scene and the officers had searched the area thoroughly to find the second bullet. He further testified the first officers who secured the area would have known they were responsible for securing the scene and would have checked anything that was removed to make sure that it had no evidentiary value.

{¶ 22} Mark Bumgarner, a detective sergeant with the Perrysburg City Police Department, confirmed Cartwright's testimony about the search. Bumgarner testified the second bullet, which matched the bullets in the gun, was recovered from the doctors who

removed it from B.W. He spoke briefly with R.B. who indicated B.W. was not permitted in the apartment. R.B. stated she had called B.W. to let her know she could help go through the boxes, but she was not to come to the apartment. R.B. also indicated that there were problems between appellant and B.W.

{¶ 23} Patrick Jones, a police officer with the Perrysburg Police Department, testified he was the first officer to arrive on the scene. As he exited the elevator on the third floor, he found R.B. talking on her cell phone and appellant sitting on a bench at the end of the hall. Brenneman was standing between appellant and the weapons and informed the officer the guns were those used by appellant.

{¶ 24} The Bureau of Criminal Investigation ("BCI") determined the guns were operable and the two spent shell casings recovered at the scene were from the guns. Officer Jones obtained gunshot residue from appellant's hands that was tested by the BCI and determined to be consistent with the primer residue from the bullet found by the medics. The police department did not conduct a DNA test because they had a witness who could testify appellant had possession of the guns.

{¶ 25} None of the witnesses indicated appellant believed the victim had a gun or other weapon. Officer Jones first learned of B.W.'s purse when she asked for it at the hospital. The officer could not recall having seeing R.B. or B.W. with the purse at the apartment or the presence of a purse in the apartment. R.B. would not have been permitted to enter the apartment until after it was searched.

11.

{¶ 26} B.W. told Jones:  appellant had also put the guns to her head, her siblings had told her not to come to the apartment, she and appellant did not get along, she did not always agree with her siblings regarding her mother's care, and that the door was unlocked and she walked in, not that the door was open.  B.W. never told him that she had a permit to carry a concealed weapon.

{¶ 27} The day after the shooting, Jones interviewed B.W. again and she did not indicate that she made any statement to appellant before she turned to get her purse.  She stated she was headed toward her purse to get something just prior to being shot.  B.W. seemed more clear-headed during the third interview on April 8th.  At that time, she said the door was unlocked and she walked into the apartment.

## Assignment of Error No. 1

### Motion to Suppress Incriminating Statements

{¶ 28} In his first assignment of error, appellant argues that the trial court erred by denying his motion to suppress the statements which appellant made to Officer Layton and Deputy Chief Rose of the Perrysburg Police Department on April 7, 2015, while he was in custody and had invoked his right to counsel.  In his motion to suppress, appellant argued that his incriminating statements were elicited in violation of his Fifth Amendment right to counsel pursuant to *Miranda v. Arizona*, 384 U.S. 436, 466, 86 S.Ct. 1602, 16 L.Ed.2 694 (1966).

{¶ 29} The hearing on the motion to suppress took place just prior to trial.  The parties stipulated to the following facts.  Appellant was taken into custody April 7, 2015,

12.

by the Perrysburg Police Department and placed in a holding cell. Without a break in custody, a detective attempted to interview appellant. Before the detective could recite the *Miranda* warnings, appellant stated he wanted to speak to a lawyer so the interview was terminated. The deputy chief spoke to appellant about his medical needs, specifically his diabetes, and informed him the department would retrieve his medication from his apartment. Appellant attempted to initiate a conversation with the deputy chief, but he stopped appellant.

{¶ 30} A uniformed officer remained in the holding cell to watch over appellant because of the concerns he had not eaten nor taken his insulin. The officer knew that appellant had invoked his *Miranda* rights and had no intention of interviewing him or eliciting any information from appellant. She conversed with appellant just to keep him calm and pass the time because they were together for more than an hour. They talked about sports for awhile and then appellant inquired whether the police had located his wallet, of which she had no knowledge. Appellant then stated he had been in an accident the day before and had received a citation. He stated that the other people were lucky because they were yelling at him and he did not have his guns with him or they, "probably wouldn't be here right now." The officer changed the subject to talk about places where appellant had lived. He then stated if he did not have to do a lot of time, he wanted to move to California.

{¶ 31} The court took the issue of the admissibility of the statements under advisement until they were offered into evidence through the officer's testimony during

13.

trial. The trial court ultimately concluded that the *Miranda* warnings, which were designed to prevent violation of constitutional rights in an unconstitutional interrogation, did not bar the statements in this case because there had not been a custodial interrogation. The court concluded the statements were voluntarily made during a casual conversation with the officer. Furthermore, the trial court concluded that any prejudice from the evidence did not outweigh its probative value.

{¶ 32} At trial, the state also introduced the testimony of a Wood County sheriff deputy who testified that on May 4, 2015, she was speaking to a man about a tattoo on his arm. The man indicated it related to his deceased brother and he mentioned he had a couple of other brothers who had been killed. As they were discussing senseless killings happening in the world, appellant joined in the conversation and stated, "They're killing the wrong people. They need to be killing the police." The deputy testified appellant made the statement with a "matter of fact" demeanor. Appellant did not move to suppress these statements.

{¶ 33} The Fifth Amendment to the United States Constitution protects an accused against self-incrimination by prohibiting the use in later criminal proceedings of a compelled incriminating statement made to the police during interrogation and while in police custody. *Kastigar v. United States*, 406 U.S. 441, 444-445, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), *Miranda*, 384 U.S. at 478-479, 87 S.Ct. 616, 17 L.Ed.2d 562. This right is applicable to the states through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

14.

**{¶ 34}** To protect this right, the United States Supreme Court recognized the right to consult with counsel and/or have counsel present during police custodial interrogations was essential to protecting the privilege against self-incrimination. *Miranda* at 470. Therefore, the *Miranda* doctrine must "be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Ill. v. Perkins*, 496 U.S. 292, 296, 110 S.Ct. 2394 (1990), quoting *Berkemer v. McCarty*, 468 U.S. 420, 437, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Therefore, the circumstance surrounding the statement must include "'a police-dominated atmosphere'" and compulsion "from the perspective of the suspect." *Ill*. at 296, citing *Berkemer*; *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, ¶ 35. The *Miranda* doctrine does not apply to "an unsolicited and spontaneous statement." *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 119, citing Rhode *Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

**{¶ 35}** A defendant's statement to police is "voluntary absent evidence that his will was overborne and his capacity for self-determination was critically impaired due to coercive police conduct." *State v. Otte*, 74 Ohio St.3d 555, 562, 660 N.E.2d 711 (1996). *See also Colorado v. Spring*, 479 U.S. 564, 573-574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); Furthermore, to be a voluntary statement, a suspect must have initiated the incriminating statement in a situation where there was no police questioning or the functional equivalent of questioning, i.e., other "words or actions * * * the police should know are reasonably likely to elicit an incriminating response." *Rhode Island* at 301; *see*

15.

*also State v. Tucker*, 81 Ohio St.3d 431, 436, 692 N.E.2d 171 (1998); *State v. Williams*, 6 Ohio St.3d 281, 452 N.E.2d 1323 (1983), paragraph five of the syllabus.

{¶ 36} In this case, neither officer questioned appellant about the circumstances of the shooting. The uniformed officer in the first situation spoke casually to appellant about general topics. While her intent may have been to engage appellant in casual conversation in hopes that he would make an incriminating statement, her intent is not relevant to our inquiry. In the second situation, the deputy was not speaking to appellant. From appellant's perspective, there is no evidence that he felt that he was under "interrogation" or that he was compelled to make either incriminating statement. Therefore, police action did not violate appellant's right to counsel recognized in *Miranda* and his voluntary statements could be used against him at trial. Appellant's first assignment of error is not well-taken.

## Assignment of Error No. 2

## Manifest Weight of the Evidence

{¶ 37} In his second assignment of error, appellant argues that his conviction is contrary to the manifest weight of the evidence because he established by a preponderance of the evidence that he acted in self-defense.

{¶ 38} Even when there is sufficient evidence to support the verdict, a court of appeals may decide that the verdict is against the weight of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), paragraph two of the syllabus. When weighing the evidence, the court of appeals must consider whether the evidence in

16.

a case is conflicting or where reasonable minds might differ as to the inferences to be drawn from it, consider the weight of the evidence, and consider the credibility of the witnesses to determine if "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 39} To establish self-defense when deadly force was used, a defendant must prove that: "(1) the slayer was not at fault in creating the situation giving rise to the affray; (2) the slayer has a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the slayer must not have violated any duty to retreat or avoid the danger." *State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus.

{¶ 40} The castle doctrine is an exception to the "duty to retreat." R.C. 2901.05(B) codified and extended the common law castle doctrine. *Marts v. State*, 26 Ohio St. 162 (1875), paragraphs one and two of the syllabus; *State v. Edwards*, 1st Dist. Hamilton No. C-110773, 2013-Ohio-239, ¶ 7. Pursuant to R.C. 2901.05(B)(1) and (3), a rebuttable presumption exists that a defendant, who used "defensive force that is intended or likely to cause death or great bodily harm to another" "acted in self defense [sic] * * * if the person against whom the defensive force is used * * * has unlawfully and without privilege to do so entered, the residence * * * occupied by the person using the defensive

17.

force." This rebuttal presumption cannot be claimed "if the person against whom the defensive force is used has a right to be in, or is a lawful resident of, the residence * * *," R.C. 2901.05(B)(2)(a), or "if the person who uses the defensive force uses it while in a residence * * *and the person is unlawfully, and without privilege to be, in that residence." R.C. 2901.05(B)(2)(b).

{¶ 41} In this case, the following evidence was presented as to each prima facie element.

## Fault in Creating the Confrontation

{¶ 42} Conflicting evidence was presented regarding whether B.W. entered the apartment knowing appellant had banned her from doing so and whether B.W. entered through an open door or in a hostile manner. However, once in the apartment, there was no evidence that B.W. initiated a confrontation with appellant.

## Bona Fide Belief of Imminent Harm

{¶ 43} Appellant testified that he felt threatened because: B.W. had a mean look, she entered the door by banging it open, she carried a bag, she did not respond to him when he asked her what she was doing in the apartment, they had a bad relationship, B.W. had caused trouble in the past, B.W. had AIDS, and after he told her to leave, she reached for her purse, where he believed she kept her gun. The evidence was undisputed that B.W. had a permit to carry a concealed weapon, but there was no evidence anyone had seen her carrying her gun that day. While there was undisputed evidence that

18.

appellant and B.W. did not get along and that B.W. was a contentious person, there was no evidence that B.W. had confronted appellant that day.

## Duty to Retreat

{¶ 44} As discussed above, conflicting evidence was presented as to how B.W. entered the apartment and whether she knew appellant had banned her from entering. While this was also the apartment of B.W.'s mother, there was no evidence presented regarding whether she had forbidden B.W. from entering the apartment.

{¶ 45} We have considered the weight of the evidence presented, the credibility of the witnesses, and whether reasonable minds might differ as to the inferences to be drawn from the evidence. We conclude the jury did not lose its way in evaluating and weighing the evidence and finding the greater weight of the evidence supported a finding that B.W.'s presence in the apartment that day did not give rise to an altercation that would cause appellant to believe he faced imminent harm and needed to act in self-defense. B.W. had not threatened to harm appellant before he shot her and he had other means to remove her from the apartment. Even if a rebuttable presumption arose under the statute that appellant acted in self-defense, there was evidence presented to support a finding the presumption had been overcome and, therefore, that appellant had a duty to retreat. Therefore, we find appellant's second assignment of error not well-taken.

19.

## Assignment of Error No. 3

## Admission of Evidence

{¶ 46} In his third assignment of error, appellant argues that the trial court erred by allowing improper evidence to be submitted to the jury and prevented proper evidence from being submitted to the jury.

{¶ 47} Relevant evidence is admissible if the probative value of the evidence outweighs any prejudicial effect (i.e., unfair prejudice, confusion of the issues, misleading of the jury, etc.). Evid.R. 403 and *State v. Lang,* 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 87. The "'admission or exclusion of relevant evidence rests within the sound discretion of the trial court.'" *Id.* at ¶ 86, quoting *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus. Therefore, the trial court's exercise of its discretion will not be overturned on appeal absent a showing of an abuse of that discretion. *Rigby v. Lake Cty*., 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991), citing *State v. Finnerty*, 45 Ohio St.3d 104, 107, 543 N.E.2d 1233 (1989). An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶ 48} Appellant argues that his statements that he had been involved in a recent automobile accident and the driver was lucky appellant had not been "packing" that day and his statement that protestors "ought be shooting cop" were prejudicial and should not have been admitted into evidence. Appellant argues that these statements were introduced in violation of Evid.R. 404(B) to establish that appellant acted in conformity

20.

with his character and could not have acted in self-defense. Alternatively, appellant argues the admission of these two statements violated Evid.R. 403(A) because, although relevant, the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. Furthermore, appellant argues the trial court erred by barring appellant's testimonial evidence regarding the violent acts of the victim prior to the day of the shooting.

{¶ 49} First, Evid.R. 404(B) is not applicable to appellant's statements because the statements were not about appellant's prior criminal conduct or bad acts. *State v. Heineman*, 8th Dist. Cuyahoga No. 103184, 2016-Ohio-3058, ¶ 74; *State v. Perez*, 9th Dist. Lorain No. 98CA007235, 2000 Ohio App. LEXIS 1125, *15 (Mar. 22, 2000); *State v. Davis*, 11th Dist. Lake No. 97-L-246, 1998 Ohio App. LEXIS 6389, *12-13 (Dec. 31, 1998).

{¶ 50} Second, appellant asserts that his opinions about shooting others were prejudicial and inadmissible under Evid.R. 403, but without any explanation how the statements are *unfairly* prejudicial. We agree with the state the statements reflect appellant's calculated, violent thinking, a fact which is probative of appellant's state of mind at the time of the shooting and indicates that the shooting was not an act of self-defense. Therefore, we find the trial court did not abuse its discretion by admitting this evidence.

{¶ 51} Third, appellant has also failed to demonstrate the trial court's exclusion of appellant's testimonial evidence regarding the violent acts of the victim prior to the day

21.

of the shooting was an abuse of discretion. At trial, appellant responded "yes" to the question of whether he was "aware prior to April 7, 2015, of any violent acts that [B.W.] was involved in not with you?" The state objected and the trial court directed the answer stricken. Appellant did not proffer the expected testimony or seek the basis supporting the exclusion of the evidence.

{¶ 52} In its September 22, 2015 judgment ruling on appellant's motion for a new trial based on exclusion of this evidence, the trial court acknowledged that it had erred in excluding the evidence since it reflected his state of mind at the time of the shooting. However, pursuant to Evid.R. 103(A), the trial court determined appellant failed to preserve the record and prevented the court's improper ruling from being a basis for a new trial.

{¶ 53} On appeal appellant argues only that exclusion of the evidence was error. The trial court agreed but denied the motion for new trial on the ground that appellant failed to preserve the record and establish that the error affected his substantial rights. Appellant fails to argue that the denial of appellant's motion for a new trial on that basis was erroneous. The appellant must demonstrate both error and prejudice in order for the lower court's judgment to be reversed. *Smith v. Flesher*, 12 Ohio St.2d 107, 233 N.E.2d 137 (1967), paragraph one of the syllabus, *superseded by statute on other grounds as stated in Cleveland Elec. Illum. Co. v. Astorhurst Land Co.,* 18 Ohio St.3d 268, 272, 480 N.E.2d 794 (1985); *In re A.L.*, 2d Dist. Montgomery No. 25740, 2014-Ohio-46, ¶ 14. Therefore, we find appellant has waived appellate review of this issue.

22.

{¶ 54} Accordingly, we find appellant's third assignment of error not well-taken.

**Assignment of Error No. 4**

**Claim of Ineffective Assistance of Counsel**

{¶ 55} In his fourth assignment of error, appellant argues he was denied his right to effective assistance of counsel guaranteed by the United States and Ohio Constitutions.

{¶ 56} Appellant bears the burden of proving that his counsel was ineffective since an attorney is presumed competent. *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and *State v. Lott*, 51 Ohio St.3d 160, 174, 555 N.E.2d 293 (1990). To meet this burden of proof, appellant must show that: (1) there was a substantial violation of the attorney's duty to his client, and (2) the defense was prejudiced by the attorney's actions or breach of duty. *Strickland, supra*, at 687, and *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). Prejudice is shown where there is a reasonable probability that a different result would have occurred in the case if the attorney had not erred. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 108; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus.

{¶ 57} Appellant argues that his trial counsel rendered ineffective assistance by failing to proffer the evidence of B.W.'s specific instances of violence of which appellant knew that influenced his state of mind that he needed to defend himself.

{¶ 58} The trial court has already found that it was error to exclude this evidence but that a new trial was not warranted because appellant failed to proffer the evidence so

23.

the trial court could determine if a new trial was necessary. The state argues that the failure to proffer can be a trial strategy, and therefore does not automatically constitute a violation of counsel's duties. *State v. Warren*, 8th Dist. Cuyahoga No. 83823, 2004-Ohio-5599, ¶ 31, citing *State v. Alvis*, 4th Dist. Athens No. 1380, 1988 Ohio App. LEXIS 3369, *7 (July 28, 1988).

{¶ 59} Nonetheless, even if we characterized the failure of appellant's counsel to proffer the excluded evidence as ineffective assistance rather than a trial strategy, appellant was not prejudiced by the lack of this evidence. Appellant's purpose in introducing the evidence was to establish his state of mind at the time of the shooting relevant as to whether he was afraid B.W. was going to shoot him and had acted in self-defense.

{¶ 60} R.B. testified B.W. was violent, had threatened to hurt appellant, B.W. had been banned from the apartment for being verbally abusive, and B.W. was upset about being banned from the apartment. R.B. also testified B.W. had caused a disturbance at their mother's new residence which resulted in the police becoming involved. M.W. testified that while he had seen B.W. and appellant argue only once, B.W. argued with everyone a lot. There was ample testimony B.W. carried a weapon and she testified she had shot her dog. There was testimony from appellant and R.B. that appellant was afraid of B.W. because she had AIDS. Appellant testified B.W. accused him of harming her mother, B.W. had been disrespectful in the past, she entered the home aggressively knowing she had been banned from returning, she had a violent history with appellant,

24.

and she had responded to his corporal punishment when she was 17 by throwing a knife at him.

{¶ 61} Furthermore, there was evidence that appellant had not acted in self-defense. There was no evidence that B.W. was armed that day. B.W. testified she was leaving the apartment at the time appellant shot her from behind. There was also appellant's statements about his violent state of mind, i.e., that he, or others, should shoot others.

{¶ 62} Therefore, we conclude that was not a reasonable probability that appellant would not have been convicted even if his attorney had proffered the evidence of B.W.'s additional prior violent acts. Accordingly, we find appellant's fourth assignment of error not well-taken.

{¶ 63} Having found the trial court did not commit error prejudicial to appellant and that substantial justice has been done, the judgment of the Wood County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.　　　　　　　　　　＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　　　　　　　　　　　　　　　　　　　　　　　　　　JUDGE

Arlene Singer, J.

Stephen A. Yarbrough, J.　　　　　　　　　　＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
CONCUR.　　　　　　　　　　　　　　　　　　　　　　JUDGE

　　　　　　　　　　　　　　　　　　　　　　＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　　　　　　　　　　　　　　　　　　　　　　　　　　JUDGE