[Cite as *State v. Reyes-Figueroa*, 2020-Ohio-4460.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 108609 |
| v. | : | |
| EDWIN REYES-FIGUEROA, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 17, 2020

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-629036-A

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Blaise D. Thomas and Joanna Lopez,
Assistant Prosecuting Attorneys, *for appellee.*

Eric L. Foster, *for appellant.*

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Defendant-appellant, Edwin Reyes-Figueroa ("appellant"), appeals his convictions following a jury trial. For the reasons that follow, we affirm.

{¶ 2} Appellant shot and killed Jonathan Benitez-Machuca ("Jonathan"). As a result, appellant was named in a five-count indictment charging him with one

count each of aggravated murder, murder, felonious assault, discharge of a firearm on or near prohibited premises, and tampering with evidence. All counts except the tampering offense carried both one- and three-year firearm specifications. The case proceeded to trial and the jury considered the following evidence.

{¶ 3} On April 30, 2018, appellant was finishing his 12-hour shift at U.S. Cotton where he had recently been promoted to a supervisor role. Jonathan worked on the production line that appellant was now be supervising. Appellant stated that on this day, he changed Jonathan's job placement to a different production line because he needed production on Jonathan's current line "to be better." (Tr. 1194.) Appellant testified that he and his supervisor told Jonathan about the job reassignment — "I made the change and [Jonathan] became upset." (Tr. 1192.)

{¶ 4} Jonathan's brother, Jorge Benitz-Machuca ("Jorge"), worked at U.S. Cotton with his brother and they rode to and from work together. Following his morning shift, Jorge saw his brother and appellant arguing. According to Jorge, appellant challenged Jonathan to a fight and it was appellant's idea to have the fight off premises because of security cameras. Jorge drove his vehicle, with Jonathan as his front-seat passenger. Jorge stated that appellant told him to follow him.

{¶ 5} The jury watched surveillance video of the parking lot at U.S. Cotton, and multiple witnesses, including Jorge, testified about the events depicted and individuals captured on the video. Witnesses identified Jonathan as the man

walking to Jorge's car in the parking lot. The video shows Jonathan pacing and raising his arms at someone, who trial witnesses identified as appellant. After Jonathan gets into the Jorge's car, they leave the parking spot.

{¶ 6} The video shows Jorge stopping his car, and an individual exiting the car. Appellant drives behind Jorge and waits. Witnesses stated that there was enough room for appellant to go around Jorge's vehicle and exit the parking lot. The surveillance video then shows Jorge pulling over toward the edge of the driveway just past the gate. Appellant then drives his vehicle alongside Jorge's car. Although Jonathan exits the car, he does not approach appellant's vehicle. After a few seconds, appellant pulls in front of Jorge's vehicle, turns right out of the driveway, and speeds off quickly and out of view. The surveillance video also shows Jorge's vehicle slowly turning right and driving out of view.

{¶ 7} Jorge told the jury what occurred after they left the parking area. He testified that he saw appellant pull over to the side of the road and he pulled ahead of appellant, but in the middle of the road. He stated that Jonathan did not have anything in his hands as he exited the passenger side of the vehicle. According to Jorge, appellant opened his car door, pulled a gun from his waistband, and immediately started shooting at Jonathan. Jorge testified that Jonathan attempted to cover himself by turning away from appellant. During the shooting, Jorge saw appellant's passenger move into the driver's seat of appellant's car. According to Jorge, there was a pause between the shots fired.

{¶ 8} Following the shooting, Jorge witnessed appellant approach Jonathan, who was shot multiple times and lying face-down on the ground. According to Jorge, appellant told Jonathan, "We are not in Puerto Rico." (Tr. 854.) Jorge then saw appellant get into the passenger seat of his vehicle and watched them drive away from the scene.

{¶ 9} Kelia Cruz ("Cruz"), who worked the same shift as Jonathan and appellant at U.S. Cotton, testified that she saw Jonathan and appellant having a conversation outside of the factory, near the exit of the building. She stated that according to their "negative" body language, (tr. 428) it appeared that the two men were going to get into a fight. She stated that Jonathan was raising his arms. Cruz testified that she learned from her friend, Kenneth Parilla ("Parilla"), that Jonathan and appellant were going to fight.

{¶ 10} Parilla testified that the interaction between appellant and Jonathan was "like inciting to fight." (Tr. 595.) He initially believed that they were going to fight in the parking lot, but when they left the lot, he and Cruz followed them with the intention of watching the fight. He and Cruz testified that as they were driving, they heard gunshots and when they arrived near West 150th street, they saw Jonathan lying on the ground.

{¶ 11} Appellant's father-in-law, Ramon Caceres ("Caceres"), was also indicted in relation to Jonathan's murder and charged with murder, felonious assault, discharge of a firearm on or near prohibited premises, and tampering with evidence. Caceres entered into a plea agreement with the state in which he agreed

to plead guilty to attempted felonious assault and attempted tampering with evidence in exchange for his "full cooperation and truthful testimony against [appellant] consistent with prior statement to Cleveland police and proffer."

{¶ 12} Caceres also worked at U.S. Cotton with appellant and they often rode to work together. He stated that on the day of the shooting, he was leaving the factory after his shift when he saw appellant and Jonathan arguing. According to Caceres, both men were "very, very upset." (Tr. 763.) Appellant did not tell Caceres what he and Jonathan were fighting about, but when they got into the vehicle, appellant only stated, "let's go." (Tr. 800.) Caceres testified that they initially followed Jorge's vehicle out of the parking lot. However, when Jorge stopped before leaving the gate, appellant pulled alongside Jorge's vehicle. Despite their cars being side by side, Caceres stated that nothing was said between appellant and Jonathan. Afterwards, appellant pulled in front of Jorge's vehicle and left the premises with Jorge and Jonathan following.

{¶ 13} Caceres testified that he believed they were heading home. However, appellant pulled over to the side of the street. Caceres initially stated that Jorge's vehicle had "blocked [them] in." (Tr. 768.) Later, he testified that Jorge's car was not blocking them, but pulled over to the side of the street "as well." (Tr. 812.) After Jorge stopped his car, Jonathan exited the vehicle. Caceres stated he could not see Jonathan's hand and believed that he was reaching for something. He denied seeing Jonathan with a weapon, making threatening gestures, or making any verbal threats. Caceres, however, saw appellant reach under the

driver's seat and pull out a black firearm. According to Caceres, appellant opened the door to the vehicle, and with one foot still inside the car, began shooting at Jonathan. He stated he heard multiple shots, then a pause, then more shots. Caceres stated that during this time, he became fearful and moved over to the driver's seat of the vehicle because he was going to leave the scene. He watched appellant walk over to Jonathan, who was lying on the ground. He stated that there was a brief conversation between appellant and Jonathan, but he did not hear what was said between them. Afterward, appellant got into the vehicle, and Caceres drove them away.

{¶ 14} Dr. Andrea McCollom performed Jonathan's autopsy. It revealed that Jonathan suffered from six gunshot wounds — four to the posterior or backside of his body, one to his right hand, and one to his left wrist. Dr. McCollum testified that the gunshot wound to Jonathan's right palm had an exit wound and no injuries to his fingers. She opined that the fingers were not in the path of the bullet, suggesting that his palm was open.

{¶ 15} Curtiss Jones, from the Cuyahoga Medical Examiner's Office, testified that an examination of Jonathan's clothing did not reveal signs of fouling, residue, grains, or wipe-off rims, suggesting that the shots fired by appellant were not in close range to Jonathan.

{¶ 16} Appellant testified on his own behalf contending that he did not challenge Jonathan to a fight and that he only shot him out fear and in self-defense. He stated that after he left the parking lot at U.S. Cotton, he was driving home and

noticed that the car Jonathan was riding in was following "really close" behind him. (Tr. 1203.) According to appellant, this made him nervous, so he pulled over to let them pass and leave. He stated that the car "blocked" his car and Jonathan exited the passenger side of the vehicle. Appellant initially testified that he noticed Jonathan holding something, but later testified that Jonathan was reaching behind his back. Appellant stated that Jonathan's actions caused him to panic. Thinking that Jonathan had a gun, and out of fear for his life, he shot at Jonathan "four or five times," (tr. 1205) with a short pause between certain shots. Appellant stated that after he shot Jonathan, who was now lying face down on the street, he walked over to him and asked him "why did you do it?" (Tr. 1205.) Later he testified that he asked Jonathan "what did you do?" (Tr. 1240.) Appellant then got into the passenger seat of his car and Caceres drove them from the scene.

{¶ 17} Appellant admitted that he always carries his firearm despite not having a CCW license. Additionally, he admitted on cross-examination that Jonathan never got close to his car and that he never saw Jonathan with a gun prior to him shooting. He denied that he shot Jonathan after he fell to the ground and denied that he made any comment about Puerto Rico before he fled the scene. Appellant further admitted that he disposed of his gun in a lake and lied to police about shooting Jonathan.

{¶ 18} Detective Astrid Vega-Feliciano served as an interpreter when Detective David Shapiro initially interviewed appellant. She testified that during

the interview, appellant never stated that he was fearful for his life, that Jonathan had a weapon on his person, and that he acted in self-defense.

{¶ 19} The jury found appellant guilty of all charges, including all firearm specifications. The trial court sentenced him to a total sentence of 28 years to life in prison.

{¶ 20} Appellant now appeals raising four assignments of error.

## I. Self-Defense Jury Instruction

{¶ 21} Appellant asserted at trial that he was acting in self-defense when he shot and killed Jonathan. In his first assignment of error, appellant contends that the trial court abused its discretion by refusing to instruct the jury on self-defense because the evidence was sufficient to support the instruction. Specifically, appellant challenges the trial court's determination that the record contained no evidence that appellant used reasonable force. (Tr. 1269.)

{¶ 22} When reviewing a refusal to give a requested jury instruction, an appellate court considers whether the trial court's refusal was an abuse of discretion under the facts and circumstances of the case. *State v. Wolons*, 44 Ohio St.3d 64, 541 N.E.2d 443 (1989).

{¶ 23} Three days before trial on March 29, 2019, the amended version of R.C. 2901.05, the statute that governs self-defense as an affirmative defense, became effective. The law now provides:

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person

used the force in self-defense, * * * the prosecution must prove beyond a reasonable doubt that the accused did not use the force in self-defense, * * * as the case may be.

R.C. 2901.05(B)(1). The law now shifts the burden of proof on a self-defense claim from the defendant to the prosecution, *provided that* "there is some evidence presented that *tends to support*" that the defendant used the force in self-defense. (Emphasis added.)

{¶ 24} "Placed in context, the phrase 'tends to support' does not connote that a new standard should apply to the determination of whether a defendant is entitled to a self-defense instruction. In order for evidence that 'tends' to support an affirmative defense, it must be sufficient to raise a question in the mind of a reasonable juror, as is already required under the existing standard set forth in [*State v.*] *Melchior*[, 56 Ohio St.2d 15, 381 N.E.2d 195 (1978)]." *State v. Tolle*, 4th Dist. Adams No. 19CA1095, 2020-Ohio-935, ¶ 24.

{¶ 25} Prior to the statutory amendment, it was well-settled that the proper standard for determining whether a defendant had successfully raised self-defense was to inquire whether the defendant had introduced sufficient evidence that, if believed, would raise a question in the minds of reasonable jurors concerning the existence of such issue. *Melchior* at paragraph one of the syllabus. "If the evidence generates only a mere speculation or possible doubt, such evidence is insufficient to raise the affirmative defense, and submission of the issue to the jury will be unwarranted." *Id.*

**{¶ 26}** To establish a self-defense claim, the defendant must introduce sufficient evidence on the following elements: "(1) that the defendant was not at fault for creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger." *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002).

**{¶ 27}** Often missing from quotations of the self-defense elements is the requirement that the force used be reasonable. *State v. Gray*, 2d Dist. Montgomery No. 26473, 2016-Ohio-5869, ¶ 8. "A person is only privileged to use that force which is reasonably necessary to repel the attack." *Id.*; *State v. Hendrickson*, 4th Dist. Athens No. 08CA12, 2009-Ohio-4416, ¶ 23, citing *State v. Williford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990) (Another component contained within the second element is the defendant's bona fide belief that the use of force was "reasonably necessary to repel the attack.").

> In other words, a defendant must show that "that the degree of force used was 'warranted' under the circumstances and 'proportionate' to the perceived threat." *Hendrickson* at ¶ 31, citing *State v. Palmer*, 80 Ohio St.3d 543, 564, 687 N.E.2d 685 (1997). "If * * * the amount of force used is so disproportionate that it shows an 'unreasonable purpose to injure,' the defense of self-defense is unavailable." *State v. Macklin*, 8th Dist. Cuyahoga No. 94482, 2011-Ohio-87, ¶ 27, quoting *State v. Speakman*, 4th Dist. Pickaway No. 00CA035, 2001-Ohio-2437 (Mar. 27, 2001). *Accord State v. Kimmell*, 3rd Dist. Wyandot No. 16-10-06, 2011-Ohio-660, ¶ 20, quoting *Hendrickson* at ¶ 33 ("Self-defense * * * is inappropriate if the force used is 'so grossly disproportionate as to show revenge or as criminal purpose.'"). "[I]t is only when one uses a greater degree of force than is necessary under all

the circumstances that it is not justifiable on the ground of self-defense." *McLeod* at 157.

*State v. Waller*, 4th Dist. Scioto Nos. 15CA3683 and 15CA3684, 2016-Ohio-3077, ¶ 26.

{¶ 28} In this case, the trial court found that the appellant presented some evidence that he was not at fault for creating the situation (tr. 1258) and some evidence, "even if it was de minimis," that appellant did not violate a duty to retreat. (Tr. 1269.) The trial court, however, found that appellant produced no evidence that tended to support that he used reasonable force; thus, the court denied the instruction (Tr. at *id.*) Appellant contends that the trial court's decision was erroneous.

{¶ 29} Even viewing the evidence in the light most favorable to the appellant, we find that the trial court did not abuse its discretion in denying appellant's request for a self-defense jury instruction. Appellant testified that he was acting in self-defense; however, this testimony alone does not warrant a self-defense instruction. *See State v. Voss*, 12th Dist. Warren No. CA2006-11-132, 2008-Ohio-3889, ¶ 56 (where there was no evidence in the record, other than the defendant's own self-serving statements that she was acting in self-defense, to support the elements of a self-defense claim, the trial court did not err by failing to give a jury instruction).

{¶ 30} The only evidence supporting appellant's use of deadly force as reasonable is his and Caceres's testimony that they believed that Jonathan had a gun when they saw him place his hand behind his back as he exited Jorge's car. Both

admitted, however, that they never saw Jonathan holding a gun prior to appellant shooting Jonathan. Appellant testified that Jonathan "charg[ed]" at him. (Tr. 1224.) Caceres, however, gave conflicting testimony, but viewing Caceres's testimony in favor of appellant, he stated that Jonathan "walked" toward appellant. (Tr. 773.) However, by appellant's own account, Jonathan was not able to get close to appellant before appellant shot him. (Tr. 1225.)

{¶ 31} Although he believed Jonathan was reaching for a gun, appellant produced no testimony that Jonathan was known to carry a firearm or that appellant had knowledge that Jonathan was known to carry a firearm. This knowledge would support appellant's belief that Jonathan's unexposed hand was reaching for a weapon. *Compare State v. Bond*, 6th Dist. Wood No. WD-15-070, 2016-Ohio-8383 (court considered fact that victim had a CCW license and was known to carry a firearm in deciding whether defendant acted in self-defense); *State v. Gott*, 6th Dist. Lucas L-11-1070, 2013-Ohio-4624 (court analyzed rules of evidence for admissibility of testimony that victim carried a gun in deciding defendant's self-defense claim); *State v. Stamper*, 3d Dist. Wyandot No. 16-2000-06, 2000 Ohio App. LEXIS 4115 (Sept. 13, 2000) (no self-defense finding even though defendant knew the victim carried a knife, and was afraid of the victim because of this knowledge, but no testimony was given that defendant saw the victim with a knife that day).

{¶ 32} Additionally, no one testified that Jonathan made any lethal threats as he exited Jorge's car and approached appellant's car. These threats coupled with an unexposed hand reaching behind someone could create a reasonable belief that

the person had a weapon. *Compare State v. Gay*, 9th Dist. Summit No. 26487, 2013-Ohio-4169 (consideration of whether the victim was reaching for a firearm and making lethal threats in deciding whether the defendant acted in self-defense).

{¶ 33} Based on the record before this court, we find that the evidence produced and relied upon by appellant only generated mere speculation. There was no evidence that tended to support that appellant's use of deadly force was reasonable force in this matter. Accordingly, the trial court did not abuse its discretion in denying appellant's request for a self-defense jury instruction. The first assignment of error is overruled.

## II. Effective Assistance of Counsel

{¶ 34} After the trial court denied appellant's request for a self-defense jury instruction, defense counsel continued to assert that appellant acted in self-defense. In fact, during closing arguments and over repeated objections by the state and multiple side-bar discussions, defense counsel asked the jury to find that appellant acted in self-defense when he shot Jonathan. Appellant contends in his second assignment of error that he was denied his right to effective assistance of counsel when his counsel essentially asked for jury nullification. He claims that he was prejudiced by not having the benefit of a closing argument that was consistent with the law.

{¶ 35} To establish ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonable representation, and that he was prejudiced by that performance. *State*

*v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 205, citing *Strickland v. Washington*, 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052 (1984). Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694. In evaluating a claim of ineffective assistance of counsel, a court must be mindful that there are countless ways for an attorney to provide effective assistance in a given case, and it must give great deference to counsel's performance. *Id.* at 689. Trial tactics and strategies do not constitute a denial of effective assistance of counsel. *State v. Gooden*, 8th Dist. Cuyahoga No. 88174, 2007-Ohio-2371, ¶ 38, citing *State v. Clayton*, 62 Ohio St.2d 45, 402 N.E.2d 1189 (1980).

{¶ 36} "Jury nullification is a trial jury's inherent right to disregard its instructions (i.e., the letter of the law), and to reach a verdict based upon its own collective conscience." *Cleveland Constr., Inc. v. Ohio Pub. Emps. Retirement Sys.*, 10th Dist. Franklin No. 07AP-574, 2008-Ohio-1630, ¶ 38, citing Scheflin, *Jury Nullification: The Right to Say No*, 45 S.Cal.L.Rev. 168 (1972); *Black's Law Dictionary* 875 (8th Ed.2004). Despite this nullification power, a court will not instruct a jury on such power. *See State v. Foti*, 11th Dist. Lake No. 2009-L-163, 2010-Ohio-5931, ¶ 100-101 (a jury may render a verdict at odds with the evidence or the law, but a trial court is not required to inform the jury about jury nullification);

*State v. Jackson*, 10th Dist. Franklin No. 00AP-183, 2001 Ohio App. LEXIS 589, 35-36 (Feb. 20, 2001).

{¶ 37} In this case, we find that defense counsel's performance was not deficient. Who shot and killed Jonathan was not at issue. Appellant's theory at trial was that this was not a planned killing; rather, it was a spontaneous event where he acted in self-defense. When the trial court denied appellant's request for a self-defense jury instruction, appellant lost his trial theory of self-defense. Accordingly, it was reasonable and a matter of strategy to seek jury nullification. *See State v. McGilton*, 5th Dist. Muskingum No. CT08-0002, 2008-Ohio-5432 (trial counsel's strategy of having the defendant confess to the crime with the hope of jury nullification did not constitute ineffective assistance of counsel).

{¶ 38} Moreover, we find that counsel's assertion of self-defense also challenged the elements of the aggravated murder offense by raising doubt that this was a planned killing — suggesting that appellant did not act with prior calculation and design. Accordingly, it was reasonable for trial counsel to continue to maintain that this was a spontaneous eruption of events precipitated by appellant's perceived, albeit mistaken, belief that Jonathan had a firearm when he exited Jorge's car.

{¶ 39} Accordingly, appellant did not receive ineffective assistance of counsel. Rather, our review of the record demonstrates the counsel advocated zealously, attempting to salvage any remaining defense that existed. Appellant's second assignment of error is overruled.

## III. Sufficiency of the Evidence — Prior Calculation and Design

{¶ 40} In his third assignment of error, appellant contends that the evidence does not support his conviction for aggravated murder because the evidence was insufficient to support that he acted with "prior calculation and design" in killing Jonathan. He makes no other sufficiency challenge on appeal regarding his other convictions.

{¶ 41} When assessing a sufficiency-of-the-evidence challenge, a reviewing court must "examine [all] the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶ 42} Appellant was convicted of aggravated murder under R.C. 2903.01(A), which provides, in relevant part, "No person shall purposely, and with prior calculation and design, cause the death of another." "The phrase 'prior calculation and design' by its own terms suggests advance reasoning to formulate the purpose to kill. Evidence of an act committed on the spur of the moment or after

momentary consideration is not evidence of a premeditated decision or a studied consideration of the method and the means to cause a death." *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 18. The existence of prior calculation and design is determined on a case-by-case analysis of the facts and evidence. *State v. Jones*, 91 Ohio St.3d 335, 345, 744 N.E.2d 1163 (2001). Although there is no bright-line rule for determining prior calculation and design, courts traditionally consider three factors in determining whether a defendant acted with prior calculation and design:

> (1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or "an almost instantaneous eruption of events"?

*State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997), quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825, 828 (8th Dist.1976). Courts should weigh these factors with the totality of the circumstances surrounding the murder. *Jenkins* at *id.*

{¶ 43} In this case, appellant and Jonathan knew each other. Appellant testified that earlier that day, he reassigned Jonathan to another production line because performance on Jonathan's original line was not efficient. According to witnesses, Jonathan was upset with the reassignment and following work, an argument between appellant and Jonathan occurred in the parking lot. Accordingly, the relationship between the two was arguably strained.

{¶ 44} The evidence also supports that appellant chose the murder site and weapon. Witnesses testified that they followed appellant and Jonathan from the parking lot and off the premises to observe the fight between them. Although appellant denied that the two were going to engage in a fight, he stated that he stopped and pulled his vehicle over on a side street to allow Jorge's vehicle to pass because it was following too closely. Appellant testified that he always carries his firearm in his vehicle and testimony revealed that he exited his vehicle with the gun readily available in his waistband. Accordingly, viewing the evidence in the light most favorable to the state, appellant gave thought in choosing both the murder weapon and murder site.

{¶ 45} Finally, the murder was arguably drawn out. Caceres testified that appellant reached under the car seat and retrieved his firearm, placing it inside his waistband. However, when he opened the car door, still having one foot inside the vehicle, he pulled the weapon from his waistband and began firing at Jonathan. *State v. Coley*, 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001) ("[P]rior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes."). Moreover, although appellant stated he believed Jonathan had a gun, which is why he fired the weapon, witnesses testified that there was a pause between those gunshots. Accordingly, even if appellant did not have the purpose to kill Jonathan, this momentary pause is sufficient to conclude that appellant knowingly and purposely intended to finish the course of action, i.e. kill Jonathan. *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996,

¶ 46.  (Evidence of prior calculation and design includes facts that demonstrate appellant's conduct "went beyond a momentary impulse and show that he was determined to complete a specific course of action.").

{¶ 46} Accordingly, viewing the evidence in favor of the state, a rational trier of fact could have found the element of prior calculation and design proven beyond a reasonable doubt.  The state presented sufficient evidence to support appellant's conviction of aggravated murder.  The third assignment of error is overruled.

## IV.  Manifest Weight of the Evidence — Prior Calculation and Design

{¶ 47} Appellant contends in his fourth assignment of error that his aggravated murder conviction is against the manifest weight of the evidence because the evidence demonstrates that he did not act with "prior calculation and design" in killing Jonathan, but rather acted in self-defense.  He does not challenge that his other convictions are against the manifest weight of the evidence.

{¶ 48} The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * *, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.'"  *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 10, quoting *Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541, at paragraph two of the syllabus.

{¶ 49} "'Weight of the evidence concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on its effect in inducing belief.'"  *Eastley* at ¶ 12, quoting *Thompkins* at 387.  In a manifest

weight analysis, this court sits as a "thirteenth juror," and reviews "'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at *id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 50} This case is not the exceptional case where the jury lost its way in finding appellant guilty of aggravated murder. The evidence presented at trial revealed that there was a disagreement between appellant and Jonathan after work. The testimony revealed that appellant and Jonathan left the premises to engage in a fight. However, appellant exited his vehicle, pulled a firearm from his waistband, and opened fire toward Jonathan, striking him repeatedly. No one testified that they saw Jonathan with a gun or that Jonathan was making any threats or threatening gestures toward appellant when Jonathan exited Jorge's vehicle. Appellant admitted that he fired four to five shots. And witnesses testified that there was a pause between the first couple of shots and the last few gunshots. Jorge and Caceres testified that Jonathan attempted to cover himself once appellant started shooting, and medical records revealed that the Jonathan suffered a total of six gunshot wounds, with four gunshot wounds to the backside of his body.

{¶ 51} It is reasonable to conclude that if appellant genuinely believed that he was acting in self-defense and shooting Jonathan was not purposeful, then he would not have fled the scene. And it is reasonable to conclude that when the police

initially questioned appellant about the murder, he would have told them that he believed he was in fear of his own life and therefore shot Jonathan in self-defense. However, appellant left the scene following the shooting, disposed of the firearm, and denied that he shot Jonathan when questioned by police.

{¶ 52} Finally, appellant's subsequent conduct of walking over and making a statement to Jonathan, who was lying on the ground bleeding from multiple gunshot wounds, reveals that this was an intentional killing. Although appellant stated he posed a question to Jonathan — "why did you do it?" (tr. 1205), or "what did you do?" (tr. 1240), others testified that he sneered to Jonathan "We are not in Puerto Rico." This statement, coupled with appellant's subsequent actions, reveal that appellant did not act in self-defense, but rather with prior calculation and design.

{¶ 53} Accordingly, after weighing the evidence and all reasonable inferences and considering the credibility of witnesses we find that the jury did not lose its way in finding appellant guilty of aggravated murder. The conviction is not against the manifest weight of the evidence. Appellant's fourth assignment of error is overruled.

{¶ 54} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's

convictions having been affirmed, any bail pending is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

FRANK D. CELEBREZZE, JR., P.J., and
EILEEN A. GALLAGHER, J., CONCUR