[Cite as *State v. Hoskin*, 2022-Ohio-3917.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | : | Nos. 111119, 111120, and 111121 |
| v. | : | |
| | : | |
| SEAN T. HOSKIN, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, VACATED IN PART,
AND REMANDED
**RELEASED AND JOURNALIZED:** November 3, 2022

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-19-642961-A, CR-19-644629-A, and CR-20-652363-A

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Eben McNair, Kristin Karkutt, Alicia
Harrison, and Margaret Graham, Assistant Prosecuting
Attorneys, *for appellee*.

Flowers & Grube, Louis E. Grube and Melissa A. Ghrist,
*for appellant*.

LISA B. FORBES, J.:

{¶ 1} Sean T. Hoskin ("Hoskin") appeals his murder and felonious-assault

convictions and his associated sentence of life in prison with eligibility for parole

after 36.5 years. After reviewing the facts of the case and pertinent law, we affirm Hoskin's convictions, vacate his 4.5-year prison sentence for the firearm specification associated with the felonious assault, affirm the remainder of his sentence, and remand the case to the lower case for proceedings consistent with this opinion.

## I.    Facts and Procedural History

{¶ 2}    This case involves the death of Vernon Norman ("Norman"). On May 23, 2020, Toya Johnson ("Johnson") and her youngest child spent their first night at the house she rented at 391 E. 162nd Street in Cleveland (the "house" or the "crime scene"). Johnson invited Norman, who is the father of the child, to spend the night at the house. Norman and the child fell asleep downstairs, and Johnson fell asleep upstairs.

{¶ 3}    Johnson woke up to see Hoskin, who is Johnson's former boyfriend, standing on the roof of the house outside of the second-story bedroom window. Hoskin came into the bedroom through the window, and a tussle ensued between Hoskin and Johnson. Johnson cried for help, and Norman ran upstairs. When Norman saw the two arguing, he went back downstairs and Hoskin ran after Norman.

{¶ 4}    Johnson heard three gunshots and went downstairs. Johnson saw that Norman had been shot, and he fell down on the kitchen floor. Johnson heard Hoskin say that he had been shot. Hoskin had a gun in his hand. Johnson called

911, and Hoskin fled the scene. Norman died at the scene. It is undisputed that in the early morning hours of May 24, 2020, Hoskin shot and killed Norman.

{¶ 5} On September 17, 2020, Hoskin was indicted for Norman's murder and other associated offenses in Cuyahoga C.P. No. CR-20-652363-A. On May 13, 2021, Hoskin pled guilty to various drug-related offenses in two other cases, Cuyahoga C.P. Nos. CR-19-642961-A and CR-19-644629-A.

{¶ 6} On November 5, 2021, a jury found Hoskin guilty of murder in violation of R.C. 2903.02(B), with one- and three-year firearm specifications, and felonious assault in violation of R.C. 2903.11(A)(1), with one- and three-year firearm specifications in CR-20-652363-A. Hoskin was found not guilty of various offenses including aggravated burglary and assaulting Johnson. The court found Hoskin guilty of a 4.5-year firearm specification associated with the murder, a 4.5-year firearm specification associated with the felonious assault, notice of prior conviction and repeat violent offender specifications associated with the felonious assault, and two counts of having weapons while under disability in violation of R.C. 2923.13(A)(2) and (3).

{¶ 7} The court merged the murder and felonious-assault convictions, and the state elected to proceed to sentencing on the murder. The court merged the two having-weapons-while-under-disability convictions, and the state elected to proceed to sentencing on one of them. On November 17, 2021, the court sentenced Hoskin to an indefinite prison term of 15 years to life for the murder, to run consecutive to 4.5 years on the firearm specification associated with the murder, to

run concurrent with three years in prison for the weapons-while-under-disability conviction. The court also sentenced Hoskin to 4.5 years for the firearm specification on the felonious-assault conviction, to run consecutive to the aforementioned sentence.

{¶ 8} The court ran this sentence of life in prison with parole eligibility after 24 years consecutive to an 18-month prison sentence in CR-19-642961-A and an 11-year prison sentence in CR-19-644629-A, for an aggregate prison sentence of life with parole eligibility after 36.5 years.

{¶ 9} It is from these convictions and prison sentence that Hoskin now appeals, raising four assignments of error for our review.

> I. The trial court erred by failing to grant the motion for judgment of acquittal as to the crimes of felonious assault and felony murder.
>
> II. The trial court erred by permitting the state to ask questions and argue about the defendant's post-arrest silence.
>
> III. The trial court erred by failing to merge gun specifications along with each underlying allied offense.
>
> IV. The finding of necessity made under R.C. 2929.14(C)(4) clearly and convincingly lack[s] support in the record, and the trial court thus erred by ordering the defendant to serve his sentences consecutively.

## II. Law and Analysis

### A. Sufficiency of the Evidence

{¶ 10} In his first assignment of error, Hoskin argues that "the trial court erred by failing to grant the motion for judgment of acquittal as to the crimes of felonious assault and felony murder." Specifically, Hoskin argues that there was

insufficient evidence to convict him of felonious assault and felony murder "because the State had not disproven any of the elements of self-defense * * *."

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

### 1. Felony Murder and Felonious Assault

{¶ 11} Felony murder is defined in R.C. 2903.02(B) as follows: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit [a qualifying] offense of violence * * *." Felonious assault is defined in R.C. 2903.11(A)(1) as follows: "No person shall knowingly * * * [c]ause serious physical harm to another * * *." In the case at hand, the parties do not dispute that Hoskin's felonious-assault conviction listing Norman as the victim is a qualifying offense under the felony-murder statute.

### 2. Self-defense

{¶ 12} Pursuant to R.C. 2901.05, self-defense is defined as follows:

(B) (1) A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against

another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

{¶ 13} In other words, when a defendant properly raises self-defense, the burden shifts to the state, which, to sustain a conviction, must prove beyond a reasonable doubt that the defendant: (1) was at "fault in creating the situation giving rise to the affray"; (2) "did not have a bona fide belief that he or she was in imminent danger of death or great bodily harm and that his or her only means of escape from such danger was in the use of force"; or (3) "must not have violated any duty to retreat or avoid danger." *State v. Jackson*, 8th Dist. Cuyahoga No. 108493, 2020-Ohio-1606, ¶ 17; *State v. Walker*, 8th Dist. Cuyahoga No. 109328, 2021-Ohio-2037, ¶ 13 ("in light of the cumulative nature of the self-defense elements, the state need only disprove one of the elements of self-defense beyond a reasonable doubt at trial to sustain its burden * * *.").

### 3. Trial Testimony and Evidence

{¶ 14} Our review of the trial transcript shows that the following evidence pertinent to this appeal was presented during trial.

### i. Cleveland Police Patrol Officer Michael Mazanec

{¶ 15} Cleveland Police Patrol Officer Michael Mazanec ("Off. Mazanec") testified that he was dispatched to the crime scene on the morning of May 24, 2020, as a result of a call about "a female screaming, followed by a shots-fired call, and

possibly a male shot." The female was Johnson, and Off. Mazanec said that he learned the following from her:

> She said that an ex-boyfriend came over. He was trying to get in through a window. She was trying to keep him from getting inside. When he — he was eventually able to get inside the window and they began to physically tussle with each other. And then at some point she was calling for help and the victim, [Norman,] came upstairs to see what was going on.

{¶ 16} He also learned that the ex-boyfriend who entered the house through Johnson's second-story bedroom window was Hoskin. Off. Mazanec described what Johnson had told him about Hoskin's "tussle" with Johnson as follows: Hoskin "began to choke, strangle her and she tried calling while he had her — his hand around her neck, she called for help." Norman went upstairs, and he and Hoskin had "an exchange of words." Norman and Hoskin went downstairs, and Johnson followed them. According to Off. Mazanec, "[b]efore she could get all the way downstairs, she heard a gunshot." While Off. Mazanec was speaking with Johnson at the crime scene, EMS informed them that Norman had died.

{¶ 17} As part of his investigation of the crime scene, Off. Mazanec found "next to the victim in the kitchen, there was a firearm laying on the kitchen floor * * *." According to Off. Mazanec, no other firearms were recovered from the scene.

{¶ 18} On cross-examination, Off. Mazanec testified that he learned from Johnson that Hoskin knocked on her bedroom window and she opened the window in response. He also clarified that Johnson heard multiple gunshots as she was

following the two men downstairs. "I believe she said she heard, Pow, pow, pow, so multiple."

### ii. Toya Johnson

{¶ 19} Johnson testified that she has known Hoskin since she was about 13 or 14 years old. They dated from 2005 through 2008, he helped raise her two older children, and the two remained friends. She began dating Norman in 2017. Norman and Johnson lived together from 2017 until February 2020, although Johnson testified that from February 2020 until Norman's death in May 2020, she and Norman were "working on [their] relationship."

{¶ 20} In the spring of 2020, Johnson began looking for a new place to live with her three children. Asked if she had "any plans on moving anyone else in with you other than your children," Johnson answered, "No." Asked specifically if she had "any intention of having * * * Hoskin move in with you," she answered, "No." Johnson further testified that Hoskin gave her money on "any occasion. Whenever I asked him or I needed him or I needed it or anything for [when the] kids needed something * * *. If he had it, he would give it." Johnson paid the security deposit and first month's rent for the house, although she testified that her "sister gave me some money that she said that [Hoskin] had given to her and I assumed that was to help me with whatever I needed help with." According to Johnson, she signed the lease on May 14, 2020. This lease was introduced into evidence, and Johnson is the named tenant, with her three children listed as "residing with [her] at that address."

{¶ 21} Johnson invited Norman to stay with her and the children at the house on the first night they stayed there, May 23, 2020. The house was unfurnished, other than two air mattresses and personal belongings.

{¶ 22} Norman played with the baby, Norman and Johnson "got some liquor and started drinking," and Norman and the baby fell asleep on the air mattress downstairs sometime around 11:00-11:30 p.m. Johnson went upstairs and fell asleep on the air mattress in one of the bedrooms.

{¶ 23} In the early morning hours of May 24, 2020, Johnson woke up because she "heard something on the window." She jumped out of bed and saw Hoskin in the window. Johnson said, "Oh, my god, what is you doing here? What's wrong with you? What's wrong? What's going on? Do you want me to call the police? What is you here for? [Norman] and the baby is downstairs asleep. What are you doing? And I reached to try to grab my phone." Johnson did not recall if she opened the window, but she testified that she did not invite Hoskin into the house. In fact, she told him to leave. "I said, You need to get the hell out of here, my baby and his father is downstairs asleep. What are you doing here? You need to go. What's wrong with you? Do you want me to call the police?"

{¶ 24} Before Johnson could use her phone, Hoskin "jumped through the window and started attacking me or grabbing me. * * * Like, he pinned me up against the wall, started like shaking me at my neck with his hand, had me up on the wall. I was trying to fight him." Johnson screamed for help, and Norman ran up the stairs. According to Johnson, Norman saw that Hoskin "had his hands around [her]

neck and had [her] up against the wall." Norman asked Hoskin what he was doing, and "then [Norman] turned and ran downstairs."

{¶ 25} According to Johnson, Hoskin "took his hand off of me and turned to go after" Norman. "He ran after him, like moving fast, very swiftly." Johnson testified about what happened next:

> I stood up and ran after [Hoskin]. And by the time I turned — I hear three shots go off and as I'm turning, I see [Norman] falling down to the ground and I run over to him. And [Hoskin] is telling me, No, No, No, stop, I'm shot, I'm shot. And I'm screaming. And I'm trying to help [Norman]. And I'm trying to, like, call 911 and give him CPR. And [Hoskin] is still screaming, telling me that he got — he was shot, he was shot, and telling me to come here.
>
> And I stand up and I try to call 911 and he grabbed my phone and he tries to break it. Then after he do that, I jump up and I'm running because I don't know what's about to happen and * * *
>
> I don't know if he about to try to kill me or my baby or what, so I just didn't want to be a sitting target so I kept moving around. And I went to the door and I guess I locked it and ran out.

{¶ 26} Before she ran out of the house, she saw Hoskin with a gun. "[W]hen I was trying to help [Norman] and I turned and I looked, I did see [Hoskin] standing there because he had the gun in his hand when he was saying, I'm shot, I'm shot, He's not shot, I'm the one that's shot, the gun was in his hand." Johnson did not see any "injuries" on Hoskin. Johnson called 911, and Hoskin left the scene before the police arrived. Johnson testified that she did not see Norman with a gun that night.

{¶ 27} On cross-examination, Johnson testified that she did not see who was shooting when she heard the gunfire. She did not know who fired the first, second, or third shot. When she ran out the back door, Hoskin followed her and tried to get

her to come back inside. Johnson testified that she did not know if Hoskin was trying to help Norman or help himself. "I remember him tugging on me and pulling on me, trying to drag me back in the house when I was outside."

{¶ 28} According to Johnson, when she was cleaning out the apartment after this incident, she found a bullet[1] in one of the kitchen cabinets. Johnson turned this over to the police.

### iii. Curtiss Jones

{¶ 29} Curtiss Jones, the trace evidence unit supervisor for the Cuyahoga County Medical Examiner's Office, testified that Norman had gunshot residue primer on his hands, which could mean one or a combination of three things: Norman fired a gun; Norman was in close proximity to a gun that was just fired; or Norman handled something that had gunshot residue on it. Additionally, Norman tested negative for trace metal on his hands. According to Jones, the results of these tests are inconclusive as to whether Norman fired a gun.

### iv. Neighbors

{¶ 30} James Maruna testified that he lives on E. 162nd Street in Cleveland, two doors down from the crime scene. In the early morning hours of May 24, 2020, he heard four gunshots and a woman's screams coming from the house. Reginald Perkins testified that he lives at 390 E. 163rd Street in Cleveland. He woke up

---

[1] Johnson testified that she found a bullet and turned it over to the police. Asked if she knew the difference between a bullet and a shell casing, she answered, "No." According to evidence in the record, Johnson turned a .380 shell casing over to police.

around 6:00 a.m. on May 24, 2020, to his dog barking. He heard two gunshots, looked out his window, and saw and heard "a lady in the backyard screaming."

### v. Detective Hale

{¶ 31} Cleveland Police Crime Scene Detective Michael Hale ("Det. Hale") testified that he responded to the homicide call at the crime scene on May 24, 2020. Det. Hale recovered a "Smith & Wesson Shield .380" handgun found on the kitchen floor near Norman's body. He also collected a Smith & Wesson .40 spent casing from the kitchen floor. Additionally, Det. Hale testified that there was a "bullet hole in the cabinet" in the kitchen, and he recovered a bullet that he "dug * * * out of the" inside of the kitchen cabinet.

{¶ 32} According to Det. Hale, the .380 handgun's magazine holds eight bullets. When he found the gun on the floor, it had one bullet in the chamber and six in the magazine, for a total of seven unfired bullets.

### vi. Dr. Armstrong

{¶ 33} Dr. Erica Armstrong testified that she is a deputy medical examiner forensic pathologist for the Cuyahoga County Medical Examiner's Office, and she performed the autopsy on Norman. Norman was shot in the chest, and the bullet exited his body through his back. According to the autopsy report, the "gunshot wound proceeds from right to left, front to back, and downwards." Dr. Armstrong testified that the cause of Norman's death was a gunshot wound, and the manner of death was homicide.

### vii. Jeffrey Oblock

{¶ 34} Jeffrey Oblock testified that he is a forensic scientist for the Cuyahoga County Regional Forensic Science Laboratory in the DNA department. He tested the .40 Smith & Wesson spent casing found at the crime scene, the fired bullet found lodged in the kitchen cabinet, and the .380 gun found at the crime scene.

{¶ 35} Oblock also tested "two swabs of suspected blood" from the bullet hole in the kitchen cabinet door. The DNA on these swabs matched Norman's DNA. A match was also established between Norman's DNA and the "touch DNA" found on the .380 firearm recovered from the crime scene. This "touch DNA" also contained DNA from two "unknown contributors," but there was "no statistical support for a match" between this and DNA from Johnson or Hoskin. Oblock testified that no human DNA was found on the spent .40 casing recovered from the scene.

### viii. Edward Lattyak

{¶ 36} Edward Lattyak testified that he is the firearms section supervisor at the Cuyahoga County Medical Examiner's Office. In relation to this case, Lattyak tested the "Smith & Wesson .380 auto caliber semi-automatic handgun" that was found on the kitchen floor of the crime scene; the "discharged .40 caliber" cartridge case that was found on the kitchen floor of the crime scene; the fired bullet found lodged in the kitchen cabinet; and a ".380 auto caliber cartridge case" that Johnson turned over to the police.

{¶ 37} According to Lattyak, the .380 casing "displayed similar overall * * * markings" to the .380 gun, but he was not able to conclusively say that the gun in question "was the only gun that could have fired that cartridge case." Lattyak further testified that the .40 casing and the fired bullet "were most consistent with being fired or discharged in a Smith & Wesson firearm * * *."

{¶ 38} Lattyak subsequently tested a Smith & Wesson .40-caliber handgun that was submitted to his laboratory and made a positive match, concluding that the bullet recovered from the kitchen cabinet at the crime scene and the .40 casing found on the kitchen floor of the crime scene were fired from this submitted firearm.

{¶ 39} Lattyak also testified that when he received this .40-caliber firearm, "the gun was not functioning as intended." It was not incapable of firing, but the main spring guide rod was damaged, and it was not functioning like a semi-automatic weapon. According to Lattyak, "If you were not holding the slide fully forward with a significant pressure, yeah, I think there would be a good chance the shooter itself could be injured * * *."

### ix. Detective Borden

{¶ 40} Cleveland Police Homicide Detective David Borden ("Det. Borden") testified that he arrived at the crime scene "[a]round 8:00 in the morning" on May 24, 2020. Det. Borden interviewed Johnson, who was still visibly upset and crying. Det. Borden testified that he "obtained information that Sean Hoskin had climbed up onto the second story roof and gained entry into the home through an upstairs window."

{¶ 41} Hoskin was not at the scene when Det. Borden arrived, and the police could not locate Hoskin or his car. The police had a description of Hoskin's car as a "silver four-door sedan which we believed was a Honda Accord." Video surveillance footage from a nearby plumbing store showed a "silver four-door sedan traveling in the direction of the victim's house at 5:16 in the morning," and "traveling away from the crime scene" at 6:04 a.m. on May 24, 2020, which is "right after the call for the shots fired came in at 391 East 162." The vehicle in the video was never identified.

{¶ 42} According to Det. Borden, Hoskin was arrested and taken into custody in Indiana in July 2020. At one point, Johnson contacted Det. Borden and turned over to him a .380 casing she found while cleaning out the house. Additionally, Det. Borden received a "hit" from the National Integrated Ballistic Information Network that the .40-caliber casing found on the kitchen floor of the crime scene was "connected to a gun that was recovered by the Second District when they arrested a male off of State Road on murder."

### x. Sean Hoskin

{¶ 43} After the state rested its case-in-chief, Hoskin testified on his own behalf. The pertinent parts of his testimony follow.

{¶ 44} Hoskin testified that he had been dating Johnson off and on since 2005, and they were raising their son and Johnson's daughter together. When Hoskin was released from prison in 2011, he found out that he was not the biological father of Johnson's son. According to Hoskin, he remained a father figure to Johnson's two children. Seven months later, Hoskin went back to prison and

remained there for the next seven years.  Prior to his release from prison in 2018, Hoskin learned that Johnson was dating Norman.

{¶ 45} According to Hoskin, at this time, his relationship with Johnson was "nonexistent."  Hoskin testified that he saw Norman "like five times," and they "have a common belief, he's like my comrade * * *."

{¶ 46} According to Hoskin, sometime after February 2020, he and Johnson agreed to move into the house together.  Specifically, "either we would split the rent and the deposit and I would just buy all the furniture or I would pay the whole rent and deposit and then she bought all the furniture."

{¶ 47} Hoskin testified that he came back into town after "running from something" in the early morning hours of May 24, 2020.  He went to see Johnson at her old house, but Johnson's sister told him that Johnson was at the "new house."  Hoskin went to the house and saw Johnson's car and another car in the driveway.  Johnson knocked on the front door and the back door of the house, but nobody answered.  Hoskin climbed a tree and jumped onto the roof.  Hoskin testified that, "I'm tired, you know what I mean?  I want to go in, I want to lay down."  Hoskin tapped on the window and "there's [Johnson].  I jump.  She jump."  According to Hoskin, Johnson opened the window.  Asked "did you feel that you were invited in," Hoskin answered, "Yes, I do."

{¶ 48} According to Hoskin, Johnson wanted to explain why Norman was sleeping in the house.  Hoskin testified as follows about what happened next:

I said, No. We about to go downstairs, wake him up, we about to get to the bottom of this. I'm tired of your games. She said, Of what? I said, Yeah, we about to go wake him up and get to the bottom of this. She immediately goes crazy, fighting me. So when she start punching, I don't hit women so I'm trying to block. You know what I'm saying? I'm like, Man, chill, what the f*** is you doing? You know what I'm saying?

{¶ 49} Hoskin testified that Johnson called for Norman, and Hoskin "wrapped [Johnson] up with [her] shirt." Norman came upstairs, and Johnson continued to attack Hoskin. Johnson told Norman to "run, run, * * * go get your shit, go get your shit." Hoskin testified that Norman looked at him, "and he shooting down the steps. * * * So when he shoot down the steps, I go to go after him, you know, to stop him. * * * So I go down the steps." Asked why he went down the steps, Hosking testified as follows:

Because in my mind, [Johnson] told [Norman] to go get a weapon and I wanted to stop [Norman] from doing that * * *.

So by that point, she had, like, already send him in a frenzy, so he runs down, you know. * * * So I get to the bottom of the steps, I look to the right to see if I can see him. I don't see him. I look straight, I see Duder on the floor. * * * So when I looked * * * left, he's just now turning the corner to the kitchen. * * *

So when I hit the corner going to the kitchen, you know, he's, like, running towards the counter. So while he's running to the counter, I'm like, Bro, what you doing? He looked back and he hopped up on the counter. * * * So he's reaching on top of the counter and I can hear like (indicating), you know what I'm saying? * * * So he looks back one more time and then he comes down like a crouching position on the counter but he had the gun in his hand.

{¶ 50} Hoskin testified that he told Norman "Please don't." Hoskin and Norman begin to "tussle" and Norman "shot" his gun. Hoskin testified that "I thought, in my mind, that by the time he came up with his gun to shoot, right, that I

would be able to shoot him." However, according to Hoskin, "[i]t don't work like that. It's only in the movies." Asked if there was any way for him to leave, Hoskin answered, "I mean, if I turned around and tried to run toward the front door, back door, he'd have shot me." Hoskin further testified as follows: "I thought I was shot. I thought if I didn't act, I was going to — he was going to kill me."

{¶ 51} According to Hoskin, he took out his gun "[w]hen I saw [Norman] coming down from the top shelf with his gun." Hoskin testified that he did not fire his gun until after Norman fired at him. Asked if he had any intention to harm Norman, Hoskin stated, "Absolutely not. If I didn't have my gun, then I would be dead."

### 4. Analysis of Sufficiency of the Evidence and Self-Defense

{¶ 52} On appeal, Hoskin argues that the trial court erred by denying his Crim.R. 29 motion for acquittal "after the State's case concluded because the State had not disproven any of the elements of self-defense after its burden to do so was triggered under R.C. 2901.05." We reiterate that the starting point of the new self-defense burden-shifting analysis is to determine whether self-defense was raised, and if it was, whether the state refuted beyond a reasonable doubt one of the self-defense elements.

{¶ 53} We note that the court stated on the record when denying Hoskin's motion for acquittal after the state's case-in-chief: "And at this point there's no evidence of self-defense." We disagree. We find that there was some evidence presented during the state's case-in-chief tending to support that he may have acted

in self-defense. Johnson testified that, upon her arrival downstairs, Hoskin said he was shot. A .380 handgun with Norman's DNA on it was found lying next to Norman's body on the kitchen floor. This is not the gun that was used to kill Norman. Two neighbors heard more than one gunshot on the morning of May 24, 2020. *See State v. Reyes-Figueroa*, 2020-Ohio-4460, 158 N.E.3d 939, ¶ 24 (8th Dist.) (noting that, for evidence to tend to show self-defense, "it must be sufficient to raise a question in the mind of a reasonable juror * * *"). In light of the foregoing evidence, we find that self-defense was at issue in the case at hand.

{¶ 54} Once self-defense is at issue, the burden shifts to the state to prove, beyond a reasonable doubt, that Hoskin did not act in self-defense by showing that he: (1) was at "fault in creating the situation giving rise to the affray"; (2) "did not have a bona fide belief that he or she was in imminent danger of death or great bodily harm and that his or her only means of escape from such danger was in the use of force"; or (3) "must not have violated any duty to retreat or avoid danger." *Jackson*, 8th Dist. Cuyahoga No. 108493, 2020-Ohio-1606, at ¶ 17.

{¶ 55} In assessing whether the defendant was at fault in a self-defense scenario, courts ask "in essence, whether the defendant was the initial aggressor." *State v. Gardner*, 8th Dist. Cuyahoga No. 110606, 2022-Ohio-381, ¶ 25. Ohio courts have held that "[t]his concept is broader than simply not being the immediate aggressor. [A] person may not * * * voluntarily enter an encounter and then claim a right of self-defense." *State v. Nichols*, 4th Dist. Scioto No. 01CA2775, 2002 Ohio App. LEXIS 329, 10 (Jan. 22, 2002).

{¶ 56} Upon review, we find that the state presented sufficient evidence to show that Hoskin was at fault in creating the situation that led to Norman's death. It is undisputed that when Norman went upstairs, he found Hoskin and Johnson arguing. It is also undisputed that Norman ran back downstairs and Hoskin followed him.

{¶ 57} The facts of the case at hand show that the state presented evidence demonstrating that Hoskin chose to follow Norman downstairs. Hoskin provided additional testimony that he thought Norman was going to get a gun, and he chose to engage Norman because he wanted to "get to the bottom" of why Johnson was "playing games" with him. "Ohio courts have long recognized that a defendant is at fault in creating the situation giving rise to the affray when the defendant chooses to confront the victim or knowingly go to a place where the victim will be, even when the defendant's action was otherwise completely lawful." *State v. Elam*, 12th Dist. Butler No. CA2021-08-106, 2022-Ohio-1895, ¶ 15.

{¶ 58} Because the state presented sufficient evidence to disprove Hoskin's theory of self-defense, we cannot say that the trial court erred by failing to grant Hoskin's motion for acquittal, and his first assignment of error is overruled.

**B. Post-Arrest Silence**

{¶ 59} In his second assignment of error, Hoskin argues that "the trial court erred by permitting the state to ask questions and argue about the defendant's post-arrest silence." Specifically, Hoskin argues that this court should reverse his

convictions because the state "asked him why he did not speak with police after his arrest and asked jurors to infer guilt from that fact * * *."

{¶ 60} A prosecutor's comments regarding a criminal defendant's post-arrest silence or refusal to testify may violate his or her constitutional right to remain silent. *State v. Thompson*, 33 Ohio St.3d 1, 4, 514 N.E.2d 407 (1987); Fifth Amendment to the United States Constitution. *See also Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (a prosecutor violates a defendant's right to remain silent when he or she uses the defendant's post-*Miranda* silence to impeach the defendant in court).

{¶ 61} We review the prosecutor's comments and questions about the defendant's right to remain silent under the harmless error standard set forth in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See State v. Jaradat*, 8th Dist. Cuyahoga No. 88290, 2007-Ohio-1971. Under *Chapman*, the harmless error standard requires "the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 24. *See also State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 162, citing *Thompson* at 4-5 ("recognizing that a violation of a defendant's constitutional right against self-incrimination is subject to harmless-error review"); Crim.R. 52(A) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.").

{¶ 62} During Hoskin's cross-examination, the following colloquy occurred regarding Hoskin's first interview with Cleveland police detectives after being arrested in Indiana in July 2020:

Q: And you chose not to tell them this version of events, how in fear of your life you were at that point in time?

A: You have a right to remain silent. Anything you say can and will be used against you in a court of law.

Q: All right. And now today though, today is the first time —

A: Yes.

Q: — in almost 18 months that you decided to break that silence?

A: And I couldn't wait.

Q: Well, you did. Because you never went on the record —

A: It killed me.

Q: — to tell anybody this?

A: It killed me. I know, you're right.

Q: So you waited until you heard all of the evidence in the case and then you stood up and told your story, correct?

A: I'm not that good, ma'am.

[DEFENSE COUNSEL]: Objection, your Honor.

[PROSECUTOR]: To what?

THE COURT: Overruled. Overruled.

Q: So you've had time to think about what you wanted to say from May 24th of last year until today? Yes or no?

A: No.

Q: Okay. And you didn't stick around on May 24th, turn in your gun and tell the police what happened?

A: No.

Q: And, in fact, the first time that you've ever gone on record to talk about what happened is here today in the courtroom?

A: Of course.

Q: Thank you.

{¶ 63} Furthermore, in closing arguments, the prosecutor stated the following to the jury:

> Self-defense, ladies and gentlemen, is a position of righteousness, right? When you're in the right, you stand up and say, I did what I had to do. I was in the right. He didn't do that. He left, first of all. He didn't stay on scene. He didn't tell this cockamamie story to the police on the 24th of May. He didn't do it when he was taken into custody in July.
>
> He sat around and thought about the story for seventeen months before he uttered a word of that ridiculousness —
>
> [DEFENSE COUNSEL]: Objection.
>
> [PROSECUTOR]: that you heard on the stand.
>
> THE COURT: She can argue.
>
> [PROSECUTOR]: You stand up and say, You're right, I committed murder because before you even get to self-defense, we have to prove to you beyond a reasonable doubt all of the elements of those offenses. It's not you dance around it and say, I didn't kill him, I didn't commit a murder, but I acted in self-defense. That's not the way that works. It's a position of righteousness. You're right. You're damn right I killed that guy. And here's why.

{¶ 64} Without deciding whether the prosecutor's questions and argument regarding Hoskin's post-arrest silence violate his constitutional right to remain silent, we first consider whether this conduct was harmless. "To determine whether

a prosecutor's conduct was harmless, we shall consider the extent of the comments, whether an inference of guilt from silence was stressed to the jury, and the extent of other evidence suggesting appellant's guilt." *State v. McMillion*, 11th Dist. Ashtabula No. 2005-A-0016, 2006-Ohio-3229, ¶ 27.

{¶ 65} Ohio courts have concluded that "where references to the criminal defendant's [post-arrest] silence in both the State's case-in-chief and its closing argument have permeated the trial, the effect is prejudicial so as to deny the defendant the right to a fair trial." *State v. Harris*, 9th Dist. Lorain No. 11CA009991, 2012-Ohio-2973, ¶ 6. Furthermore, the Ohio Supreme Court has held that "[w]here evidence has been improperly admitted in derogation of a criminal defendant's constitutional rights, the admission is harmless 'beyond a reasonable doubt' if the remaining evidence alone comprises 'overwhelming' proof of defendant's guilt." (Citations omitted.) *State v. Williams*, 6 Ohio St.3d 281, 290, 452 N.E.2d 1323 (1983).

{¶ 66} In the case at hand, the prosecutor's conduct regarding Hoskin's post-arrest silence was limited to one line of questioning during Hoskin's cross-examination and comments during closing argument, all of which related to Hoskin not asserting self-defense immediately after the incident or at any time prior to trial. Accordingly, we find that these references did not permeate the trial. Furthermore, the court instructed the jury that opening statements and closing arguments by counsel "are permitted in an effort to assist the jury," but these "arguments may not be considered as evidence by the jury." Additionally, we find that Hoskin's own

testimony that he followed Norman down the stairs is overwhelming evidence that Hoskin created the affray that led to Norman's death.

{¶ 67} Upon review, we find that any error the trial court committed by allowing the state to question or comment on Hoskin's post-arrest silence was harmless because it did not permeate the trial so as to affect the outcome of trial. Accordingly, Hoskin's second assignment of error is overruled.

## C. Merger of Firearm Specifications with Underlying Offense

{¶ 68} In his third assignment of error, Hoskin argues that "the trial court erred by failing to merge gun specifications along with each underlying allied offense." Specifically, Hoskin argues that the 4.5-year firearm specification for the felonious-assault conviction "erroneously survived merger of that offense into [the] murder" conviction.

{¶ 69} R.C. 2929.14(B)(1)(g) states that if an offender is "convicted of or pleads guilty to" two or more felonies, one of which is a felony noted in the statute, the trial court is required to impose a sentence on two of the most serious associated firearm specifications. In *State v. Doyle*, 2019-Ohio-979, 133 N.E.3d 890, ¶ 27 (8th Dist.), this court vacated a sentence for a firearm specification "attendant to [an] offense * * * for which no sentence was imposed[.]" The *Doyle* Court explained that "firearm specifications are not separate offenses capable on standing alone. * * * The applicability of the specification rises and falls with a conviction of the underlying offense * * *." *Id.* at ¶ 19.

{¶ 70} The Ohio Supreme Court has certified a conflict amongst this state's districts on the following issue:

> Whether Ohio's legislature has specifically authorized cumulative punishments for multiple firearm specifications that were committed as part of the same act or transaction under the narrowly tailored, specifically designated circumstances set forth R.C. 2929.14(B)(1)(g), when the underlying felonies attendant to the firearm specifications are merged at sentencing * * *.

*State v. Bollar*, 164 Ohio St.3d 1409, 2021-Ohio-2795, 172 N.E.3d 178.

{¶ 71} It is undisputed in the case at hand that Hoskin's felonious-assault conviction merged with his murder conviction, and the state elected to proceed to sentencing on the murder conviction. The court, however, sentenced Hoskin to a 4.5-year prison term for the firearm specification on the murder conviction and a 4.5-year prison terms for the firearm specification on the assault conviction, to run consecutively.

{¶ 72} As *Bollar* remains pending in the Ohio Supreme Court, we follow this court's decision in *Doyle* and find error in the trial court's imposition of multiple firearm specifications subsequent to the merger of Hoskin's murder and felonious-assault convictions. Accordingly, we sustain Hoskin's third assignment of error and vacate his 4.5-year prison sentence associated with the felonious assault.

## D. Consecutive Sentences

{¶ 73} In this fourth and final assignment of error, Hoskin argues that "the findings of necessity made under R.C. 2929.14(C)(4) clearly and convincingly lack support in the record, and the trial court thus erred by ordering the defendant to serve his sentences consecutively." Specifically, Hoskin argues that because he was

"sentenced to life in prison with only the 'possibility' of parole, consecutive sentences are not 'necessary' to protect the public or punish him."

### 1. Standard of Review

{¶ 74} R.C. 2953.08(G)(2) provides, in part, that when reviewing felony sentences, the appellate court's standard is not whether the sentencing court abused its discretion; rather, if this court "clearly and convincingly" finds that (1) "the record does not support the sentencing court's findings under * * * (C)(4) of section 2929.14 * * * " or (2) "the sentence is otherwise contrary to law," then we may conclude that the court erred in sentencing. *See also State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231. In *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649, ¶ 39, the Ohio Supreme Court clarified that R.C. 2953.08(G)(2) "does not provide a basis for an appellate court to modify or vacate a sentence based on its view that the sentence is not supported by the record under R.C. 2929.11 and 2929.12."

{¶ 75} "[T]o impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry * * *." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37. Pursuant to R.C. 2929.14(C)(4), the court must find consecutive sentences are "necessary to protect the public from future crime or to punish the offender"; "not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public"; and at least one of the following three factors:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction * * *, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

### i. Analysis

{¶ 76} Hoskin's argument, while novel and interesting, fails as a matter of law. Hoskin does not take into account the facts of his case. Rather, he argues that, in the abstract, consecutive sentences are not "absolutely needed," "essential," "indispensable," or "requisite" to protect the public from him or punish him because he "will not be released under the parole guidelines until he has been adequately punished and no longer represents a danger to society * * *."

{¶ 77} At Hoskin's sentencing hearing, the court stated on the record that at the time of the indictment in CR-20-652363-A, Hoskin "was, in fact, a fugitive from justice being supervised, and had cases pending, serious felony cases pending." The court noted that, at the time of sentencing, Hoskin had a "very long criminal history including his behavior while incarcerated. The Court notes 51 institutional reports of violations from fighting with respect to [security threat] groups, disobedience, disturbances, * * * contraband, [and] drug use, * * * indicat[ing] that consecutive sentences are necessary."

{¶ 78} The court found that consecutive sentences were necessary "to punish this Defendant * * * and * * * to protect our community based on the way he has behaved while he's been incarcerated, and while he's not been incarcerated, as well as while he was being supervised either on bond or on probation."

{¶ 79} The record clearly and convincingly supports the court's findings that consecutive sentences are necessary to protect the public and punish Hoskin. Hoskin's undisputed criminal history speaks for itself, and the court noted that the offenses occurred while oskin was in prison, out of prison, and under supervision. In fact, Hoskin's sentence at issue is for three separate felony cases involving different offenses on different dates. In *Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, at ¶ 29, the Ohio Supreme Court held that "as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld."

{¶ 80} Upon review, we find that the trial court complied with R.C. 2929.14(C)(4) and engaged in the proper analysis for consecutive sentences. Additionally, the record clearly and convincingly supports the court's findings. Accordingly, Hoskin's fourth and final assignment of error is overruled.

## III. Conclusion

{¶ 81} Hoskin's convictions are affirmed. Hoskin's prison sentence is affirmed in part and vacated in part. Specifically, Hoskin's 4.5-year prison sentence for the firearm specification associated with the felonious assault is vacated. The

remainder of Hoskin's prison sentence — life with parole eligibility after 32 years — is affirmed. This case is remanded to the trial court to correct the sentencing journal entry to reflect the mandate of this court

**{¶ 82}** Judgment affirmed in part, vacated in part, and remanded to the trial court for the purpose of correcting the sentencing entry.

It is ordered that appellant and appellee share equally costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

EILEEN A. GALLAGHER, P.J., and
MICHELLE J. SHEEHAN, J., CONCUR